## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| IN RE: | ) | |
| | ) | Civil Action No. 05-1360 (ESH) |
| AT&T ACCESS CHARGES LITIGATION | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |

### PLAINTIFFS' OPPOSITION TO MOTION TO TRANSFER VENUE

Plaintiffs respectfully submit this opposition to AT&T's motion to transfer venue to the United States District Court for the District of New Jersey.

### INTRODUCTION AND SUMMARY

In moving that this Court override plaintiffs' choice of forum and transfer this case to New Jersey, AT&T relies principally on: (1) a string of cases that were transferred out of the District of Columbia because they involved decisions by federal government agencies that resolved land-related issues of interest to the people of the state in which the land is located and (2) the fact that some of its own employees who are potential witnesses reside in New Jersey. AT&T has failed to show that plaintiffs' choice of forum is not entitled to "great deference," *Liban v. Churchey Group II, LLC*, 305 F. Supp. 2d 136, 142 (D.D.C. 2003) and has failed to meet its "burden of demonstrating that an action should be transferred." *Air Line Pilots Ass'n v. Eastern Air Lines*, 672 F. Supp. 525, 526 (D.D.C. 1987). For these reasons, AT&T's motion should be denied.

In contrast to the cases cited by AT&T, this case involves AT&T practices that are national in scope and significance. Such cases have regularly been permitted to remain in this forum. For example, in *Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 18 (D.D.C. 2000), the court accorded "substantial weight" to plaintiffs' choice of the D.C. forum and denied the motion

to transfer, where plaintiffs "view[ed] this as a national issue."  Likewise, in *Greater Yellowstone Coalition v. Bosworth*, 180 F. Supp. 2d 124, 128-29 (D.D.C. 2001), this forum held that the case "has sufficient nexus to the District of Columbia and therefore deserves deference in its choice of forum" because the case has "some national significance" and "the plaintiffs' counts focus on interpretation of federal statutes and federal government officials in the District of Columbia were involved."

While they have impact through the nation, the cases before this Court stem in significant part from activities taking place in the District of Columbia.  As shown below, AT&T contends that it was justified in adopting the schemes at issue here "in reliance on" the prior decisions of the FCC (and undoubtedly on the advice of its Washington lawyers and FCC representatives).  It came to Washington to seek the FCC's approval of those schemes and was instead met with the FCC's rejection of the schemes and express invitations by the FCC to plaintiffs and others similarly situated to engage in follow-on litigation like the instant cases.  AT&T has designated its regulatory filings in the FCC proceedings it initiated as one of the four categories of documents on which it may rely at trial.  Those filings are doubly important to these cases because plaintiffs have alleged that they are among the fraudulent misrepresentations that underlie plaintiffs' claims of fraud.  Finally, while many of the calls at issue here were received by plaintiffs in this jurisdiction, it is also the case that many of the calls at issue here were placed in this jurisdiction, where they were improperly labeled and sent to plaintiffs in other jurisdictions.  All plaintiffs, including those who do not offer service in D.C.,  were underpaid on calls improperly originated by AT&T in D.C. and sent elsewhere.

The fact that some of AT&T's employees who are potential witnesses reside in New Jersey should be given no weight.  As this Court recently recognized just four months ago, in

*Green v. Footlocker Retail, Inc.*, No. 04-1875, 2005 WL 1330686, at *2 (D.D.C. June 3, 2005) (Huvelle, J.), "convenience of the witnesses is considered only to the extent that the witnesses 'may actually be unavailable in one of the fora.'"  AT&T has failed to allege that any of its New Jersey employees would be unavailable in this forum.[1]

By contrast, as this Court recently recognized in *Green*, the location of counsel, with both sides having D.C. counsel is a factor bearing consideration.  Where, as here, the location of counsel "bears directly on the cost of litigation, it becomes a factor to consider" *Kucala Enter. LTD v. Auto Wax Co.*, No. 02-1403, 2002 WL 1586415, at *3 (N.D. Ill. July 18, 2002) (quoting *Blumenthal v. Mgmt. Assistance*, 480 F. Supp. 470, 474 (N.D. Ill. 1979).  Transferring the case to New Jersey will significant increase the cost of pursuing this litigation for plaintiffs, which individually and collectively are orders of magnitude smaller than AT&T[2], and thus less able to bear the costs of litigating in an inconvenient forum.

## ARGUMENT

"Courts have discretion to adjudicate motions to transfer according to case-by-case considerations of both convenience and fairness." *Greater Yellowstone*, 180 F. Supp. 2d at 127.

---

[1] AT&T also points to RCN's employees, claiming that the fact that the headquarters of most of the RCN entities, at the time that RCN filed its complaint, was in New Jersey, and asserting that the RCN employees "who work at RCN's corporate headquarters . . . will be within subpoena range for trial. That would not be true of a trial in D.C." AT&T Br. at 8-9.  In fact, precisely the opposite is true.  As RCN informed AT&T in its Initial Disclosures filed prior to AT&T's filing of this motion, the RCN employees designated in RCN's Rule 26(a)(1) disclosure who "are presently located in New Jersey . . . will relocate to Pennsylvania in the near future and the Princeton, NJ office will be closing."  The disclosure also advised AT&T that the RCN records that are currently in New Jersey will be moved to Illinois and Pennsylvania.  Further, as reflected in RCN's 2004 10-K, filed with the U.S. Securities and Exchange Commission on May 11, 2005, RCN's executive headquarters has already relocated  to Herndon, Virginia.  RCN's key executives are all located in Herndon.  With the anticipated closing of RCN's only New Jersey offices next year, RCN's headquarters employees in Herndon will be within reach of a trial subpoena if the trial is held in D.C., but not if it is held in New Jersey.  *See* Exhibit 1, Declaration of Joseph Kahl, ¶¶ 4-7 **.**

[2] Based on its 2004 10-K, AT&T's 2004 revenues were $30,537,000,000.  The 10-Ks of the two publicly held plaintiffs, RCN and ITC^DeltaCom, reflect 2004 revenues, respectively of $487 million and $584 million.  The privately held plaintiffs had revenues, based on the Declarations of  Gary Zingaretti (Exhibit 2), Geoff Cookman (Exhibit 3), David Nilson (Exhibit 4), and  William Scott (Exhibit 5), as follows:  McClure--$2 million; Prairie Grove--$11 million, Lexcom--$37 million, Supra--$150 million, and Granite--$84 million.

In *Green,* 2005 WL 1330686, at *1, this Court set forth a 7-part test, articulating the factors that a court should weigh in evaluating a motion to transfer under 28 U.S.C. § 1404(a):

> (1) a plaintiff's privilege of choosing the forum; (2) convenience of the parties; (3) the location of counsel; (4) convenience of the witnesses, including expert witnesses; (5) the location of books and records; (6) the speed with which the underlying civil case may be resolved by the relevant courts; and (7) the interests of justice.

As the party seeking transfer, AT&T "bears the burden of establishing that the transfer of this action is proper," *Greater Yellowstone*, 180 F. Supp. 2d at 127, and that "the existing forum is inconvenient." *See Clark v. Burger King Corp.*, 255 F. Supp. 2d 334, 337-38 (D.N.J. 2003) ("unless the balance of inconvenience of the parties is strongly in favor of the Defendant, Plaintiffs' choice of forum should prevail"). Even in cases where the "plaintiff's choice of forum cannot be accorded great weight . . . there should be a clear balance of inconvenience in favor of the defendant before plaintiff's choice of forum should be disturbed."[3]

As this Court recognized in *Green*, "the court may not transfer simply because the court thinks another forum may be superior to plaintiff's chosen forum." *Green,* 2005 WL 1330686, at *2; *see also Wilderness Soc'y,* 104 F. Supp. 2d at 12 (quoting *Pain v. United Tech. Corp.*, 627 F. 2d 775, 783 (D.C. Cir. 1980) ("it is settled that a case should not be transferred 'from a plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff.'")).

Below, Plaintiffs address the factors listed by this Court in *Green* seriatim.[4] Considered together, these factors compel denial of AT&T's motion.

---

[3]*Blumenthal*, 480 F. Supp. at 474.
[4]Plaintiffs omit discussion of factor (6), the speed with which the underlying civil case may be resolved by the relevant courts. This factor was not discussed by AT&T, and has played little, if any, role in the decision of reported cases.

## I.    PLAINTIFFS' PRIVILEGE OF CHOOSING THE FORUM

While acknowledging that a plaintiff's choice of forum is generally entitled to "great deference," AT&T begins its discussion of this factor by arguing that less deference is warranted "when the forum preferred by plaintiff is not his home forum."[5]  This is simply not the law.  As AT&T concedes on the next page of its brief, a plaintiff does not lose the "great deference" accorded to its choice of forum unless the forum "has no meaningful ties to the controversy and no particular interest in the parties or the subject matter."[6]  Indeed, in *Green*, this Court adopted the latter formulation *in haec verba*.[7]  The instant case meets this test.  As shown below, there are "meaningful ties" between the District of Columbia and the controversy raised by the Complaints and Answers, this forum has a particular interest in the subject matter of these suits, and AT&T has not met its burden of establishing otherwise.

### A.    There are "meaningful ties" between the controversy and the forum.

Contrary to AT&T's assertion, there are numerous "meaningful ties" between this forum and the controversy in these cases.

#### 1.    The Complaints allege that AT&T made fraudulent misrepresentations in this forum.

Plaintiffs' fraud claim is heavily dependent on fraudulent misrepresentations made by AT&T in this forum.  This case involves two fraudulent schemes adopted by AT&T in an effort to reduce the amount of access charges AT&T paid to plaintiffs and other local exchange carriers ("LECs").  To support those schemes, AT&T filed petitions with the Federal Communications Commission (" FCC") in this jurisdiction, seeking the FCC's approval of those schemes—

---

[5] AT&T's assertion that "less deference" is accorded when plaintiff selects a forum other than his "home forum" is an overstatement.  But even if it were true, it would not support AT&T's title of this section of its brief, which flatly proclaims that plaintiffs' choice of forum is "not entitled to deference" at all.

[6] AT&T Br. at 6, *quoting Liban*, 305 F. Supp. 2d at 142.

[7] *Green*, 2005 WL 1330686, at *2; *accord*, *Greater Yellowstone*, 180 F. Supp. 2d at 124, 128 (citing cases).

approvals that were ultimately denied. Paragraph 44 of the Complaint alleges that the petitions, which were filed with the FCC in Washington, DC, "fraudulently misrepresented the extent to which [AT&T] was engaging in such schemes." Paragraph 78(a) of the Complaint, referring to statements that AT&T made in connection with those petitions, alleges that "AT&T made public statements that sought to falsely minimize the volume of traffic that it was delivering to Plaintiffs and other local exchange carriers for termination without payment of the appropriate access charges." In fact, the same Washington, DC office of Sidley Austin Brown & Wood that is representing AT&T in this litigation filed both petitions with the FCC on AT&T's behalf. AT&T's petition with regard to the earlier scheme, involving IP telephony, alleged that AT&T only routed "a small fraction" of AT&T's long-distance traffic this way, an assertion that falls within plaintiffs' contentions of fraudulent misrepresentations in ¶¶ 44 and 78(a). Thus, the truth or falsity of this DC-based assertion is one of the key underpinnings of plaintiffs' fraud claim.

> **2.    AT&T's Initial Disclosures designate numerous documents prepared for use in this forum.**

AT&T's Initial Disclosures under Fed. R. Civ. P. 26(a)(1)(B) include only four categories of documents that AT&T "may use to support its claims or defenses," and one of those categories is "regulatory filings regarding access charges, AT&T's phone-to-phone IP telephony service and AT&T's prepaid calling card service." This description would include, but not be limited to, the regulatory filings that constitute part of the fraudulent misrepresentations, as alleged in ¶¶ 44 and 78(a) of the Complaint. Quite apart from the fact that these filings support the fraud claim, AT&T's designation of these documents constitutes an admission by AT&T that its regulatory filings, submitted to the FCC in this district, are central to its defenses in this case. Attached as Exhibit 6 are the first pages of 65 regulatory filings made on behalf of AT&T, either

by its Washington DC office or the Washington DC office of Sidley Austin Brown & Wood, in the two FCC dockets referenced in ¶¶ 3, 4, 40, 42, 43, 48, 56, and 72 of the Complaint.

> **3.    Numerous calls at issue in this case were made or received in this forum**

AT&T artfully argues that "virtually none" of the calls that are the subject of the complaints were "*received* within the District of Columbia." AT&T Br. at 5 (emphasis added). While, as we show below, that assertion is not true, it is also irrelevant, because many thousands of the calls at issue were *made* in the District of Columbia, and that is where AT&T would have engaged in a significant portion the fraudulent conduct that underlies not only the fraud claim, but also all the other claims. Paragraph 30, which underlies all of plaintiffs' claims, alleges:

> AT&T repeatedly disguised interstate and intrastate long-distance
> calls as local calls, and in other cases disguised intrastate long-
> distance calls as interstate. AT&T disguised calls by concealing,
> changing, causing to be concealed or changed, or otherwise
> misrepresenting the originating telephone number transmitted with
> the call, and by materially misrepresenting other information
> provided to Plaintiffs. The information AT&T concealed, changed
> and/or misrepresented is information that is essential to the
> Plaintiffs' ability to identify whether calls are interexchange in
> nature and, if so, whether they are local, interstate long-distance or
> intrastate long-distance calls.

While AT&T implies that any wrongful conduct only took place at the terminating end of the call, the alleged conduct of "concealing, changing, causing to be concealed or changed, or otherwise misrepresenting the originating telephone number transmitted with the call" could also have taken place where the call was placed. Exhibit 1, Declaration of Joseph Kahl, ¶ 9. Even though some of the plaintiffs do not offer service in this district, they would have received calls *placed in this district* by AT&T customers as to which AT&T *in this district* concealed or changed the identifying information necessary for a plaintiff to bill and collect from AT&T the

access charges to which it was entitled.  While AT&T's conduct involved economic, rather than physical, harm to the plaintiffs, this is akin to the classic law school hypothetical of a gunshot fired from one district that wounds a person in another district.  As in the hypothetical, the wrongful conduct is not limited to the place where the injury takes place, but also includes the place where the defendant took the action that caused the injury.  Attached as Exhibits 1-5 and Exhibit 7 are declarations on behalf of all the plaintiffs reflecting the fact that they all receive numerous long-distance telephone calls placed from the District of Columbia.[8]

With regard to calls received in DC, AT&T concedes that nearly 6% of its access charges paid to RCN related to calls received by RCN in this district, while a smaller percentage of Granite's access charges relate to calls that were received in this district.[9]  Based on AT&T's exhibit, RCN estimates that it received tens of millions of minutes of AT&T calls in this district within the past three years.  Ironically, while AT&T argues that "virtually none" of the calls that are the subject of the complaints were "received within the District of Columbia,"  AT&T Br. at 5, according to AT&T's own data, approximately the same amount of service was provided by plaintiffs to AT&T in D.C. as in AT&T's preferred forum of New Jersey.[10]  The fact of the matter is that the services at issue were scattered widely throughout the United States.

AT&T's argument appears to be that because it engaged in a nationwide scheme which, according to AT&T's own public filings, led to nearly a billion dollars of potential liability, the percentage of calls sent to or from any single state or district will be small, and therefore

---

[8] Since one of AT&T's schemes involved prepaid calling cards, and since prepaid calling cards are disproportionately used by tourists to avoid high hotel and pay phone rates for long distance calls, it would stand to reason that a disproportionate share of these calls would have been made in this district by the disproportionate number of tourists who come to Washington DC.

[9] While AT&T correctly asserts that plaintiff BTI does not allege in its Complaint that it provides services in DC, in fact BTI does provide local telephone service on 53 lines in DC.  Exhibit 7, Declaration of Jerry Watts, ¶ 4**.**

[10] *See* Exhibits 1 and 2 to AT&T Declaration of Geri Lancaster, (RCN and Granite access charges to AT&T in DC in the past year totaled $$113,453.07; Granite access charges to AT&T in New Jersey in the past year totaled

plaintiffs who are scattered around the country will have no choice but to allow their suit to be consolidated in the state of AT&T's choosing.[11]

### B.    This forum has a particular interest in the subject matter of these suits.

For many reasons, this forum has a particular interest in the subject matter of these Complaints—and certainly far more interest than does New Jersey, whose only connection to these suits is the fact that AT&T is located there.[12]

### 1.    These cases were invited by the FCC's Orders

The subject matter of these suits is plaintiffs' efforts to collect damages from AT&T that flow directly from the FCC's rulings against AT&T and the FCC's explicit invitation to carriers injured by AT&T's conduct to file suit against AT&T.  Complaint ¶¶ 42, 43.  Indeed, AT&T came to DC to obtain when it hoped would be favorable rulings from the FCC endorsing its schemes.  Instead, its petitions were denied by the FCC, which issued to carriers injured by AT&T's schemes to file suits exactly like the ones filed here by plaintiffs.

In its *Prepaid Calling Card Order*, the FCC held that "the service provided to the calling card customer is a telecommunications services that is subject to intrastate access charges when calls originate and terminate in different local calling areas within the same state" and footnoted that statement by advising that because it "does not act as a collection agent," carriers such as

---

$123,339.18.)  Neither RCN nor any of the other plaintiffs provided access service to AT&T in New Jersey.  *See* Exhibits 1, 2, 4, 5, and 7.

[11] Alternatively, perhaps the implications of AT&T's argument is that since there are more people, and more calls, in California than any other state, the only way plaintiffs can avoid a motion to transfer to AT&T's New Jersey home is to file suit in California.

[12] AT&T also points to the fact that RCN's Complaint alleged that RCN's principal place of business was in New Jersey and that Granite charges AT&T more access charges in New Jersey than in DC.  As discussed above, RCN moved its executive headquarters to Herndon Virginia before it filled suit, and expects to be exiting New Jersey shortly.  And while it is true that Granite billed AT&T for more access charges in New Jersey than in DC, there were 5 other states in which Granite provided more services to AT&T than in New Jersey (Exhibit 1 to AT&T Declaration of Geri Lancaster), and Granite is the only plaintiff that actually provided service to AT&T in New Jersey.  *See* Exhibits 1, 2, 4, 5, and 7, Declarations of Gary Zingaretti, David Nilson, Joseph Kahl, Jerry Watts, and

plaintiffs should file their claims in a court or state commission.[13]  In its *Phone-to-Phone IP Telephony Order*, the FCC, after denying AT&T's petition, likewise stated that because it "does not act as a collection agent . . .we expect that LECs will file any claims for recovery of unpaid access charges in state or federal courts, as appropriate."[14]  As it emphasized in an introductory paragraph in its Answer in these cases,[15]  AT&T has appealed the FCC's *Prepaid Calling Card Order* to the U.S. Court of Appeals for the District of Columbia Circuit, further cementing the relationship between this forum and the subject matter of these cases.

### 2.    AT&T's Defenses Involve Subject Matter Unique to this Forum.

In its *Phone-to-Phone IP Telephony Order*, the FCC decided not to resolve the question of retroactive application to calls carried by AT&T prior to the FCC's adoption of its order, stating that "the nature of a particular phone-to-phone service offering, when the service was introduced, the purported basis for detrimental reliance on Commission pronouncements, and the course of dealings between the parties in a dispute may all prove relevant to the analysis."[16]  AT&T counsel have made it clear that they intend to offer evidence as to AT&T's "detrimental reliance on Commission pronouncements" as a defense, and have asserted in their Ninth

---

William Scott.  Even RCN, which formerly had its principal place of business in New Jersey, has never provided AT&T any services in New Jersey.  Ex. 1, Declaration of Joseph Kahl**, at ¶ 8.**

[13] Order and Notice of Proposed Rulemaking, *In the Matter of AT&T Corp. Petition for Declaratory Ruling Regarding Enhanced Prepaid Calling Card Services*, 20 FCC Rcd 4826 at ¶ 28, n.58 (Feb. 23, 2005).

[14] Order, *In the Matter of Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services Are Exempt from Access Charges*, WC Docket No. 02-361 (April 21, 2004) at n.92.

[15] AT&T Answer at p. 2.

[16] *Phone-to-Phone IP Telephony Order* at ¶ 23.  Plaintiffs do not agree with this statement, believing that under the filed tariff doctrine, *see, e.g., AT&T Corp. v. Central Office Tel., Inc.*, 524 U.S. 214, 230 (1998), the FCC's determination that AT&T must pay access charges prospectively under plaintiffs' tariffs compels a determination that AT&T must pay access charges retrospectively under the same tariffs.

Affirmative Defense that "Plaintiffs' request for retroactive damages is barred because such retroactive recovery would be inequitable and unlawful."[17]

Before the FCC, AT&T made the same argument, contending as follows in *ex parte* filings repeatedly submitted to the FCC by AT&T executives staffing its Washington DC Government Affairs Office:

> the entire industry . . . understood [the FCC's *Report to Congress*, 13 FCC Rcd. 11501 (1998)] as setting forth a determination that access charges would *not* apply to phone-to-phone VOIP traffic and that VOIP providers could continue to purchase other LEC termination services unless and until the Commission, in the future and on a prospective basis, ruled that something *like* access charges should apply to those service.
>
> \*     \*     \*
>
> AT&T and other VOIP providers had every reason to rely on the Commission's consistent statements and actions.
>
> \*     \*     \*
>
> AT&T and other VOIP providers reasonably understood the 1998 *Report* as a determination that VOIP is not subject to access charges.
>
> \*     \*     \*
>
> AT&T and other VOIP providers have relied on multiple agency pronouncements made in different proceedings that occurred several years apart, none of which has ever been challenged, let alone overruled.
>
> \*     \*     \*
>
> the fact that there may be "controversies"  . . . between AT&T and some ILECs over whether AT&T should pay terminating access charges has no bearing on the reasonableness of AT&T's reliance on the Commission's pronouncements.[18]

---

[17] Similarly, in its Eighth Affirmative Defense, AT&T asserted that the collection of "access charges for past periods constitutes an unjust, unreasonable, and discriminatory charge and practice in violation of the Communications Act and state law."

[18] Memorandum by AT&T Corp., February 20, 2004, filed as an attachment to *ex parte* letters filed by Robert W. Quinn, AT&T's Vice President, Federal Government Affairs (located at AT&T's Washington DC office), in WCB No. 02-361 on February 25, 2004, March 2, 2004 (twice), and March 5, 2004, and by an *ex parte* letter filed by Patrick H. Merrick, Directory – Regulatory Affairs, AT&T Federal Government Affairs (located at AT&T's Washington DC office), at 3, 14, 18, 19-20, 20n. 15 (emphasis original).

It is thus clear that AT&T vigorously fought the issue of retroactivity before the FCC. AT&T succeeded in part by getting the FCC to decline to rule—one way or the other—as to whether AT&T would be required to pay access charges on phone-to-phone IP calls placed before the FCC's decision, and is now continuing the same battle before this Court.[19]

The issue of retroactivity and the reasonableness of AT&T's alleged reliance on past FCC decisions is not the only issue that is unique to this forum. AT&T has also raised as its Seventh Affirmative Defense the contention that "Plaintiffs' Complaint is barred because it is foreclosed and preempted by the federal statutory requirement that charges for the transport and termination of telecommunications be cost-based." This is no doubt a reference to 47 U.S.C. § 252(d)(2)(a)(ii), and the extensive and bitterly fought FCC rules implementing that section. *See* 47 C.F.R. §§ 51.701 *et seq.*

Recognizing that the pervasive relationship between the claims and defenses presented here and the numerous FCC proceedings underlying them, AT&T asserts that "venue is not appropriate in D.C. merely because the lawsuit concerns an area that is regulated by one of the many D.C.-based federal agencies." AT&T Br. at 10. AT&T cites two cases in support of this assertion, neither of which is apposite here. In *DeLoach v. Phillip Morris Cos.*, 132 F. Supp. 2d 22 (D.D.C. 2000), the complaint alleged that the defendant tobacco companies has engaged in an antitrust violation by "bid-rigging" at tobacco auctions that took place in North Carolina. As

---

[19] Moreover, to the extent that AT&T claims to have reasonably and detrimentally relied on the FCC's prior rulings, such reliance would unquestionably have involved AT&T's Washington Office and its Washington DC law firm (Sidley Austin Brown & Wood), which also participated actively in these dockets, submitting two petitions, two briefs, five letters, and 56 *ex parte* filings reflecting telephone or in-person meetings between AT&T's Washington representatives and/or Washington lawyers and the FCC over the subject matter of AT&T's petitions. Thus, while the decision to go forward with the schemes would not have been made without the participation of AT&T management, it would be unreasonable to assume that AT&T's Washington Government Affairs office and its Washington counsel at Sidley Austin Brown & Wood would not have been involved to provide their interpretation of the FCC's prior rulings.

AT&T notes in its footnote describing this case, the only connection with Washington was that the USDA was charged with "generally regulating" the tobacco auction process; however, the Court based its decision on the fact that "significantly, Plaintiffs have not indicated that the USDA or any of its employees have a significant day-to-day role in managing or running these auctions." *Id*. at 25. In contrast with the USDA in *DeLoach*, which might be characterized as a "bystander" to the alleged collusion, here it is implementation of the FCC's very orders regarding AT&T's prepaid calling cards and phone-to-phone IP telephony that is at the heart of the case. Moreover, AT&T's schemes were national in scope, covering calls placed to and from every jurisdiction in this country, in sharp contrast to the alleged bid-rigging of tobacco auctions localized to North Carolina.

The second case relied on by AT&T, *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21 (D.D.C. 2002), simply cited *DeLoach*, but found that "the most persuasive factor favoring transfer of this litigation to Kansas is the local interest in deciding a sizeable local controversy at home." *Id.* at 26. The case involved the disposal and use of a discrete parcel of government real property located in Kansas, which the plaintiff claimed belonged to it under "various treaties, dating from the nineteenth century onward, between the Shawnee Tribe and the United States." *Id.* at 22.

Typical of the cases relied upon by AT&T, *DeLoach* and *Shawnee* involve controversies over land or other activities that are localized in states other than the District of Columbia.[20] By contrast, where a case has "some national significance" and "the plaintiffs' counts focus on interpretation of federal statutes and federal government officials in the District of Columbia were involved," the case "has sufficient nexus to the District of Columbia and therefore deserves

---

In addition to putting forth the defense of reasonable reliance on FCC pronouncements with respect to retroactivity, AT&T may assert the same defense with respect to the scienter element of plaintiffs' fraud claims.

deference in its choice of forum." *Greater Yellowstone*, 180 F. Supp. 2d at 128-29 (denying

motion to transfer).

Likewise, in *Wilderness Society*, 104 F. Supp. 2d at 18, the court accorded "substantial

weight" to plaintiffs' choice of the DC forum, and denied the motion to transfer where the

plaintiffs "view this as a national issue." The court distinguished *Trout Unlimited v. United*

*States Dep't of Agric.*, 944 F. Supp. 13 (D.D.C. 1996), relied on by AT&T, on the grounds that

it presented "an isolated, local" issue in which the people concerned "are located in Colorado."

*Wilderness Society*, 104 F. Supp 2d at 13. *See Greater Yellowstone*, 180 F. Supp. 2d at 129

(describing *Trout Unlimited* as involving "a very localized conflict with little national

significance").[21] Here, not only do plaintiffs view this as a "national issue," by the very nature of

AT&T's schemes, they affect calls placed in all U.S. jurisdictions. They are by no means

localized to New Jersey or any other state.

## II.    CONVENIENCE OF THE PARTIES

Obviously plaintiffs selected this forum because it is more convenient for them, while

AT&T contends that New Jersey is more convenient for it.[22] In balancing the convenience of the

parties, courts have regularly looked at their relative financial resources, and hence at their

ability to bear the costs of travel to a more inconvenient forum. As an Illinois court recently

observed, in denying a motion to transfer: "It is clear that defendant, as a national corporation

doing business in this jurisdiction, is in a better position to bear the expense of trial in Illinois

---

[20] *See* p. 20 and n. 40, *infra*.

[21] *Greater Yellowstone*, 180 F. Supp. 2d at 129, describing *Trout Unlimited*

[22] While AT&T also contends that New Jersey would be more convenient for RCN, as discussed above, RCN is in the process of exiting New Jersey entirely and moving its headquarters to Herndon, Virginia. As a result, this forum will soon be closer to RCN's headquarters than is the New Jersey forum advocated by AT&T. The same already is true for all the other plaintiffs except Granite.

than the Plaintiff could bear the expense of trial in Florida."[23]  This is true even where the parties are both corporations, but one corporation is much larger than the other, with "offices nationwide" and "with far greater capital at its disposal." *800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F. Supp. 128, 134 (S.D.N.Y. 1994).[24]

Here, AT&T has 2004 revenues of $30,537,000,000, more than 22 times the combined 2004 revenues of plaintiffs of $1,305,000,000.[25]  The increased cost of litigating these cases in New Jersey may make it infeasible for plaintiffs to pursue the litigation.  By contrast, AT&T has been litigating other similar cases in Missouri, Georgia, and Colorado, and has not moved for a change of venue in any of those cases.  Those fora are all much farther from New Jersey than this one, and the plaintiff in the Missouri case is a Texas corporation with its principal place of business in Texas[26] (and thus subject to a venue challenge similar to the one launched by AT&T here).  AT&T's failure to seek to transfer any of  those cases suggests that it can readily bear the cost of litigating in this much less distant forum and is willing to do so.  It also suggests that AT&T's motive here is to increase costs for plaintiffs by moving the case away from the location of plaintiffs' counsel and requiring them to hire New Jersey counsel, rather than to decrease its own costs.

## III.    THE LOCATION OF COUNSEL

---

[23] *Muzzarelli v. Landry's Rest., Inc.*, No. 02-7622, 2003 WL 1720065, at *2 (N.D. Ill. Mar. 31, 2003).

[24] *See Gardipee v. Petroleum Helicopters, Inc.*, 49 F. Supp. 2d 925, 931 (E.D. Tex. 1999) ("in weighing the convenience of the parties, the Court may take into account the relative financial strength of the litigants");*Goldstein v. Rusco Indus., Inc.*, 351 F. Supp. 1314, 1318 (E.D.N.Y. 1972) ("the court cannot overlook the relative means of the parties"); *Clark*, 255 F. Supp. 2d at 338 ("When considering a motion to transfer, a court may consider the 'convenience of the parties as indicated by their relative physical and financial condition'"); *Race Safe  Sys., Inc. v. Indy Racing League*, 251 F. Supp. 2d 1106, 1111-12 (N.D.N.Y. 2003).

[25]*See* p. __ and n. __, *supra*.

[26] Complaint in *Sage Telecom, Inc. v. AT&T Corp.*, No. 4:05-CV-00587-FRB (E.D. Mo. filed Apr. 12, 2005) at ¶ 7.

AT&T's contention that the location of counsel is "irrelevant in determining a convenient venue,"[27] utterly ignores this Court's opposite conclusion in *Green*. As this Court explained, the location of counsel is a factor that must be considered in ruling on a motion to transfer,[28] and expressly incorporated analysis of that factor[29] in its decision. Indeed, despite AT&T's claims of "irrelevance," the location of counsel has frequently been an important consideration in transfer motions, particularly with respect to cost consideration. "If the convenience of counsel bears directly on the cost of litigation, it becomes a factor to consider." *Kucala Enterprises, LTD v. Auto Wax Co.*, No. 02-1403, 2002 WL 1586415, at *3 (N.D. Ill. 2002), (quoting *Blumenthal v. Mgmt. Assistance*, 480 F. Supp. 470, 474 (N.D. Ill. 1979)); *see also Dean Foods Co. v. Eastman Chem. Co.*, No. 00- 3675, 2000 WL 1557915, at *4 (N.D. Ill. Oct. 19, 2004) (where both parties represented by California counsel, cost of litigation would be reduced by transfer to California); *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1311 n.22 (where all the parties in Alabama case had DC counsel, "transfer to the District of Maryland will allow all the parties to substantially reduce litigation costs, which is without question a relevant factor").

The need to secure additional counsel, as a factor in the increased litigation costs associated with transfer, also weighs against granting AT&T's motion. In *Blumenthal*, 480 F. Supp. at 474, the court noted that "plaintiffs in this action do not have New York counsel. If the action were transferred, they would be required not only to retain New York counsel, but to bear the cost of transportation for the plaintiff's present counsel to and from New York. This would

---

[27]AT&T Br. at 7.  In both of the cases cited by AT&T, plaintiff's counsel was located across the continent from the forum, so his location could hardly support plaintiff's choice of forum.  *Reiffen v. Microsoft Corp.*, 104 F. Supp. 48 (D.D.C. 2000) (transferring case to home state of *pro se* plaintiff); *McClamrock v. Eli Lilly & Co.*, 267 F. Supp. 2d 33, 40 (D.D.C. 2003) (plaintiff's lead counsel was from California; local counsel was "retained solely to facilitate the filing in the District of Columbia").
[28]*Green*, 2005 WL 1330686, at *1.
[29] *Id.* at *2.

militate against transfer."[30]  The same is precisely the case here.  In fact, both sides have

Washington DC counsel. Indeed, AT&T is using the same Washington counsel (Sidley Austin

Brown & Wood) that it used to file the petitions with the FCC that have spawned this litigation.

Apart from the fact that the same Washington DC counsel who filed the underlying FCC

petitions are a logical choice to defend this follow-on litigation, AT&T has not engaged the

Washington office of Sidley Austin Brown & Wood in this matter simply because the rules

require local counsel.  Mr. Zidlicky, AT&T's chief Washington counsel in this case, is also

counsel for AT&T in the parallel *Sage* case in Missouri.  AT&T would not be paying Mr.

Zidlicky and his Washington colleagues to represent it in the parallel Missouri unless it believed

they added value to its defense of these actions.  By contrast, no New Jersey lawyer appears to be

counsel of record for AT&T in any of the parallel actions.

      Given the great importance in this action of Communications Act issues stemming from

the two underlying FCC orders, it is unreasonable to expect that plaintiffs would be able to

litigate this action in New Jersey through the use of New Jersey counsel.  Thus, if the case is

transferred, plaintiffs will be required to pay their current DC counsel, plus counsel's travel costs

to New Jersey. They will also be required to bear the expense of engaging New Jersey counsel,

who will not be knowledgeable about the Communications Act issues underlying this case, but

will, pursuant to that court's local rules,[31] be required to be in attendance at every court

appearance, thus imposing wasteful costs on plaintiffs.  Meanwhile, AT&T may be expected to

---

[30] *See Wilderness Soc'y*, 104 F. Supp. 2d at 15: "Defendants have not demonstrated any particular hardship in litigating this suit in the District of Columbia, beyond transporting a large administrative record.  Defendants are currently represented by Department of Justice counsel . . . Moreover, plaintiff notes that  . . . the two intervenors in this case . . . have both litigated in the District of Columbia before with some frequency."  It cannot be denied that like those intervenors, AT&T has "litigated in the District of Columbia before with some frequency."

[31] Local Civ.R. 101.1(c)(4). (D.N.J.)

continue to use its present Washington and Chicago counsel—just as it is doing elsewhere--and generating no savings on counsel costs for AT&T.

## IV.    CONVENIENCE OF THE WITNESSES, INCLUDING EXPERT WITNESSES

AT&T further misconstrues the relevant standard regarding the convenience of the witnesses. The Court does not consider the convenience to AT&T's employees that may serve as witnesses but only the convenience of third party witnesses with no stake in the outcome of the litigation.

AT&T claims that since 9 of the 11 employees it listed on its Initial Disclosures are currently in New Jersey, they will be "within subpoena range for trial" and that the same is true for RCN employees who work at RCN's corporate headquarters in Princeton, New Jersey. AT&T Br. at 8-9. AT&T misapprehends the applicable legal standard. As this Court recently held in *Green*:  "convenience of witnesses is considered only to the extent that the witnesses 'may actually be unavailable in one of the fora.'"[32]  It has therefore been held that "convenience of the witnesses refers to the convenience of third party witnesses, not witnesses necessarily employed by the parties . . . Presumably, defendant can assure the testimony of its own employees, so the convenience of these witnesses does not weigh in favor or against transfer."[33] Likewise, "where, as here, the key witnesses of the party seeking transfer are employees of that party, their convenience is entitled to less weight, because that party will be able to compel their attendance at trial."[34]  AT&T has offered no evidence that any of its witnesses will be unable or unwilling to travel to this forum, or why depositions of its out-of-state witnesses "cannot be used

---

[32] *Green*, 2005 WL 1330686, at *2 (quoting *Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d at 12); *accord, Trout Unlimited*, 944 F. Supp. at 16.

[33] *Muzzarelli*, 2003 WL 1720065, at *2; *see id.* (even with respect to third party witnesses, "defendant has the burden of showing who its witnesses are, the nature of their testimony and how important that testimony will be to the case").

[34] *Gardipee*, 49 F. Supp. 2d at 929.

successfully." Moreover, AT&T has failed to provide "a general statement of the topics of each

witness' testimony," and 'absent such a showing, the motion should be denied."[35] The presence

of its witness/employees in New Jersey should therefore be accorded no weight.[36]

     As to RCN's employees, at the time that AT&T filed its brief, RCN had already advised

AT&T through its Initial Disclosures that its designated employees having knowledge would

shortly be relocating from New Jersey to RCN's Pennsylvania offices; moreover, as reflected in

Exhibit 1, Declaration of Joseph Kahl. ¶¶ 4-7.  RCN's corporate headquarters was moved to

Herndon, Virginia, which is well within 100 miles of this Court, prior to May 11, 2005, and most

of its key employees are located there.  Thus, RCN's headquarters employees will be subject to

subpoena for a DC trial, but *not* for a New Jersey trial.

## V.    THE LOCATION OF BOOKS AND RECORDS

     "Typically, the location of documents and business records is given little weight, unless

said documents 'are so voluminous that their transport is a major undertaking."'[37] AT&T's brief

fails to cite this factor as a reason for transfer.  AT&T counsel has advised counsel for Plaintiffs

that it has placed the relevant documents on CD-ROMs, thus enabling easy transport to this

forum as may be necessary.[38]

---

[35] *Pilates, Inc. v. Pilates Inst., Inc.*, 891 F. Supp. 175, 183 (S.D.N.Y. 1993); *see Falconwood Fin. Corp. v. Griffin*, 838 F. Supp. 836, 840-41 (S.D.N.Y. 1993) (party seeking transfer on grounds of witness convenience must specify substance of witness testimony so that court can weigh against other factors).

[36] *See Blumenthal*, 480 F. Supp. at 473.   The Court can also take notice of the frequent visits of AT&T employees to DC.  *See Gardipee*, 49 F. Supp. 2d at 931 (denying transfer in part because "it is customary" for defendant's employees to travel to the forum "in the ordinary course of executing company business").

[37] *Gardipee*, 49 F. Supp. 2d at 932, *quoting Met-L-Wood Corp. v. SWS Indus., Inc.*, 594 F. Supp. 706, 710 (N.D. Ill. 1984).

[38] In *Nissan Motor Co. v. BMW (US) Holding Corp.*, No. 02-1245, 2002 WL 31426654 (N.D. Ill. 2002), the court declined to transfer to defendants' headquarters state, even though plaintiff did not file suit in its home forum, noting that while the documents and some of defendants' witnesses were in the forum proposed by defendant, others were scattered around.  "The Court observes that '[e]asy air transportation, the rapid transmission of documents, and the abundance of law firms with nationwide practices, make it easy these days for cases to be litigated with little extra burden in any of the major metropolitan areas." *Id.* at *3 (quoting *Board of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F. 3d 1031, 1037 (7th Cir. 2000)); *see Blumenthal*, 480 F. Supp. at 473

## VI.    THE INTERESTS OF JUSTICE

Surprisingly, AT&T leads off its "public interest" argument by claiming that "transfer is appropriate" because the courts of New Jersey are "as familiar" as the DC Courts "with the governing law in these cases." This assertion fails to correctly state the law that provides that because defendant bears the burden of showing that a "clear balance" points in favor of transfer,[39] a "tie" goes to the plaintiff. More importantly, AT&T's underlying premise that the federal courts that will resolve this case if it is transferred to New Jersey as "as familiar" as the DC federal courts with the Communications Act issues raised in this case is ludicrous. Indeed, AT&T itself noted in its answer that it has appealed the underlying FCC decision to the DC Circuit, which by virtue of resolving AT&T's appeal will be more knowledgeable about these issues than the Third Circuit.

AT&T also attempts to conjure up an argument that New Jersey's "local interest" in the subject matter of this litigation warrants transfer. Many of the cases cited by AT&T have, in fact, pointed to the "local interest" that a proposed transferee forum has in a particular controversy. In all but one of these cases, however, the "local interest" involved questions of land use that were localized to a single state, on the rationale that "land is a localized interest because its management directly touches local citizens."[40] Indeed, one of the cases chiefly relied

---

(location of "a large number" of documents in proposed transferee forum "weighs only slightly in favor of transfer" even in 1979).

[39] *Blumenthal*, 480 F. Supp. at 474.
[40] *Southern Utah Wilderness Alliance v. Norton*, 315 F. Supp. 2d 82, 88 (D.D.C. 2004); *see Airport Working Group of Orange County*, 226 F. Supp. 2d at 231 ("It is [Orange] County,  not Washington D.C., that will be directly impacted by the resolution of the public debate over the use of the El Toro land"); *Citizen Advocates for Responsible Expansion, Inc. (I-Care) v. Dole*, 561 F. Supp. 1238, 1240 (D.D.C. 1983) (suit concerned construction of highway in Fort Worth, which is "a matter of great controversy in and concern to the Forth Worth area"); *Liban*, 305 F. Supp. 2d at 142 (allegation of discrimination in housing located in Maryland "is a controversy local to Maryland and is a case in which Maryland residents have a greater interest than do residents of the District of Columbia"); *Shawnee Tribe*, 298 F. Supp. 2d at 26 (if transfer is denied, "a case that will affect  the development of a massive area in Kansas" would be decided "in a venue with which Kansas citizens have little or no connection");  *Sierra Club v.*

upon by AT&T was later described as having been transferred because it involved "a very localized conflict with little national significance."[41]  The other case cited by AT&T involving "local interest" issues concerned events that took place in a single state.[42]

Here, by contrast, the very nature of AT&T's schemes makes them nationwide in scope, and only a minuscule percentage of the services at issue were provided in New Jersey.[43]  The AT&T calling cards at issue were sold widely, can be transported anywhere in the United States, and used to call anywhere in the United States.  Moreover, as discussed above, the schemes amount to regulatory arbitrage, and surely involved the participation of AT&T's regulatory specialists in Washington, whose counseling of AT&T as to the meaning of the FCC's prior rulings would underlie AT&T's claim that it reasonably relied on the FCC's prior rulings.[44]

Finally, "the interests of justice" certainly encompass the principles embodied in Fed. R. Civ. P. 1 that call for "the just, speedy, and inexpensive determination of every action."  As shown above, this action can be determined at less total expense in this Court than in New Jersey.

---

*Flowers*, 276 F. Supp. 62, 63, 71 (D.D.C. 2003) (case involved issuance of "mining permits for certain Everglades wetlands in southern Florida"; "decision to issue the permits is a controversy local to Florida and is one in which Florida and its residents have a great interest"); *Southern Utah Wilderness Alliance*, 315 F. Supp. 2d at 88 (case involving sale of oil and gas leases in Utah "is localized in the sense that it involves Utah lands, hence there is a strong local interest in having this case heard in Utah"); *Trout Unlimited*, 944 F. Supp. at 17 (in case seeking injunction of operation of a reservoir in Colorado, Colorado "possesses a significant and predominant interest in this suit because of the impact that the resolution of this action will have upon the affected lands, waters, wildlife and people of that state").

[41] *Greater Yellowstone*, 180 F. Supp. 2d at 129, describing *Trout Unlimited*.

[42] *See DeLoach.*, 132 F. Supp. 2d at 26 (allegations of "bid-rigging" in North Carolina tobacco auctions "are far more likely to constitute a 'matter of great public concern' to the citizens of North Carolina than to the citizens of the District of Columbia").

[43] As discussed in n. 10, above, the only plaintiff that rendered services to AT&T in New Jersey is Granite. Granite only rendered 6.69% of its services to AT&T in New Jersey.  *See* Exhibit 1 to AT&T Declaration of Geri Lancaster.

[44] *See* n. 19, *supra*.

## **CONCLUSION**

AT&T has failed to carry its burden of showing that New Jersey is clearly a more appropriate forum for this litigation. Its motion to transfer should accordingly be denied.

October 14, 2005                                      Respectfully submitted,

                                                      /s/  Joshua M. Bobeck
                                            Eric J. Branfman (DC Bar No. 164186)
                                            Joshua M. Bobeck (DC Bar No. 443620)
                                            Anitra D. Goodman (DC Bar No. 484434)
                                            SWIDLER BERLIN LLP
                                            3000 K Street, NW, Suite 300
                                            Washington, DC 20007
                                            202-424-7500

                                            Counsel for Plaintiffs

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a copy of the foregoing was served upon the attorneys

of record for Defendants via first-class mail, postage prepaid, on this 14th day of October

2005, as follows:

> David M. Schiffman
> Sidley Austin Brown & Wood LLP
> Bank One Plaza, 10 South Dearborn
> Chicago, IL  60603

\_\_\_\_\_/s/ Joshua M. Bobeck\_\_\_\_\_